FILED

2009 Aug-04  PM 03:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| HENRY CRAIG PRIDE, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-07-S-1878-NE |
| | ) | |
| LABORATORY CORPORATION | ) | |
| OF AMERICA, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Henry Craig Pride, originally filed suit in the Circuit Court for Lawrence County, Alabama, against Laboratory Corporation of America ("Lab Corp") and International Paper Company ("International Paper"). Plaintiff's claims arise from the analysis of his urine pursuant to a random drug test requested by his former employer, International Paper, and the subsequent termination of his employment. Plaintiff's state court complaint included five counts alleging claims against defendant Lab Corp and one count alleging a claim against defendant International Paper.[1] Counts I and II of the complaint alleged that Lab Corp was negligent and wanton when performing the analysis of plaintiff's urine, and, when reporting its conclusions. Counts III, IV, and V alleged claims of invasion of privacy,

---

[1] *See* doc. no. 1 (Notice of Removal), Ex. A (Complaint).

outrage, and tortious interference with a business relationship. Count VI alleges a claim of negligence against International Paper.

International Paper removed the case to this court on October 12, 2007, asserting federal question jurisdiction due to the alleged pre-emption of plaintiff's negligence claim by the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.[2]  *See* 28 U.S.C. § 1441(b).  On March 27, 2009, this court entered a memorandum opinion and order granting Lab Corp's motion for summary judgment and dismissing all of plaintiff's claims against Lab Corp.[3]

This opinion addresses International Paper's motion for summary judgment on plaintiff's only remaining claim (for negligence),[4] as well as plaintiff's motion for sanctions against International Paper.[5]  Plaintiff responded to the motion for summary judgment *pro se*, as the court allowed his attorney to withdraw.[6]  Upon consideration

---

[2]Doc. no. 1 (Notice of Removal).

[3]Doc. no. 43.

[4]Doc. no. 25.

[5]Doc. no. 51.

[6]Plaintiff's attorney first moved to withdraw from representation of plaintiff on September 23, 2008, stating that plaintiff had failed to comply with the terms of their representation agreement. Doc. no. 23.  The court denied that motion for failure to comply with the requirements of the Uniform Initial Order.  Doc. no. 24.  Plaintiff's attorney moved to withdraw for the second time on October 9, 2008.  Doc. no. 28.  Plaintiff objected to the motion, doc. no. 30, and the court denied the motion on those grounds, as well on the ground that summary judgment motions were pending against plaintiff.  Doc. no. 31.  Plaintiff's attorney filed a response to International Paper's motion for summary judgment on November 19, 2008, adopting International Paper's statement of undisputed facts and conceding that summary judgment was due to be granted on plaintiff's negligence claim against International Paper.  Doc. no. 36.  On December 1, 2008, plaintiff filed a

of the motion for summary judgment, the parties' briefs, and the evidentiary submissions, the court concludes the motion for summary judgment should be granted.  The motion for sanctions will be denied.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).[7]  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

separate *pro se* response to International Paper's motion for summary judgment, stating that he did not agree that his negligence claim against International Paper should be conceded.  Doc. no. 37.  Consequently, on December 11, 2008, the court *sua sponte* reconsidered its order denying plaintiff's attorney's motion to withdraw, rescinded that order, and granted the motion to withdraw due to the "breakdown in communication between attorney and client."  Doc. no. 39.  The court also struck the summary judgment response plaintiff's attorney had filed on his behalf and ordered plaintiff to file another response, either *pro se* or through new counsel.  *Id.*  Plaintiff complied by filing a *pro se* response (doc. no. 42), and it is that response that will be considered by the court.

[7]Rule 56 was recently amended in conjunction with a general overhaul of the Federal Rules of Civil Procedure.  The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*."  Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis supplied).  Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.

The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable [factfinder] to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (internal quotations and citation omitted) (bracketed text suppled).

## II.  STATEMENT OF FACTS[8]

[8]The Uniform Initial Order states the following with regard to the manner of stating facts in summary judgment briefs:

**D.     Manner of Stating Facts**
All briefs submitted either in support of or opposition to a motion must begin with a statement of allegedly undisputed relevant material facts set out in *separately numbered paragraphs.*  Counsel must state facts in clear, unambiguous, simple, declarative sentences.  All statements of fact must be supported by specific reference to evidentiary submissions.

. . . .

**2.     Opposing Party's Statement of Facts**
Each party opposing a summary judgment motion also must submit a statement of facts divided as follows.

**a.     Response to Movant's Statement**
The first section must consist of only the non-moving party's disputes, if any, with the moving party's claimed undisputed facts.  The non-moving party's response to the moving party's claimed undisputed facts shall be in *separately numbered paragraphs* that coincide with those of the moving party's claimed undisputed facts. Any statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the

International Paper is a producer of paper, packaging, and forest products.[9]

Plaintiff, Henry Craig Pride, began working for International Paper at its Courtland

Mill in Courtland, Alabama, during November of 1978.[10]   At all relevant times, he

was an at-will, hourly-wage employee,[11] and he was represented by the Paper, Allied-

Industrial, Chemical & Energy Workers International Union ("the Union").[12]

International Paper and the Union entered into a collective bargaining

agreement ("CBA") on June 15, 2002, and the terms of that CBA defined the

conditions of employment for represented employees at the Courtland Mill.[13]   The

CBA provided, in part that: "The parties are committed to creating and maintaining

a drug-free workplace.  As a result, the International Paper Substance Abuse Policy

will be implemented no earlier than December 1, 2002.  This policy includes pre

---

dispute is based.  *All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*

Doc. no. 8 (Uniform Initial Order), at 15-17 (emphasis in original) (footnote omitted).  International Paper followed these directives in its summary judgment brief.  *See* doc. no. 26.  In his response, however, plaintiff failed to set out, paragraph-by-paragraph, his disputes with International Paper's claimed undisputed facts.  *See* doc. no. 42.  Accordingly, all facts set forth in International Paper's brief are deemed admitted for summary judgment purposes.

[9]International Paper's evidentiary submission, Tab P (Declaration of Willie J. Fuller), at ¶ 3.

[10]*Id.  See also* International Paper's evidentiary submission, Tab A (Deposition of Henry Craig Pride), at 19.

[11]Fuller Declaration, at ¶ 10.

[12]Pride Deposition, at 31-32.

[13]Fuller Declaration, at ¶ 4.  *See also* International Paper's evidentiary submission, at Tab B (Collective Bargaining Agreement).

employment, for cause, post incident, random drug testing, and post rehabilitation testing."[14]  The International Paper Substance Abuse Policy ("the Policy") states:

> The Company's Substance Abuse Policy is to strictly prohibit (1) the use, sale, transfer, or possession of alcohol, drugs, or controlled substances while on the job or on company property, (2) the reporting to work under the influence of alcohol, drugs, or unauthorized controlled substances, and/or (3) having a detectable level of a prohibited, illegal drug or unauthorized controlled substance present in one's system.

> *A violation of this policy constitutes grounds for disciplinary action up to and including termination from employment.*  Any prohibited, illegal or unauthorized drug or controlled substance found on company property may be turned over to appropriate law enforcement authorities.

> *All employees are required to comply with this Substance Abuse Policy.  This includes all salaried and hourly-paid employees.*[15]

International Paper also publishes so-called "Drug-Free Workplace Procedures" ("the Procedures") that describe the proper processes and procedures for administering the Policy.[16]  The Procedures list "Cannabinoids, e.g., THC, Pot, Marijuana" as being among the drugs and controlled substances prohibited by the Policy.[17]  The Procedures also provide that International Paper can conduct random

---

[14]Collective Bargaining Agreement, at 88.

[15]International Paper's evidentiary submission, Tab D, at document bearing Bates Stamp No. IP 00031 (emphasis supplied).

[16]Fuller Declaration, at ¶ 6.

[17]International Paper's evidentiary submission, Tab C ("Drug-Free Workplace Procedures"), at 2.

drug testing of its employees.[18]  For all drug tests performed, International Paper has a

> clear, well-documented procedure for the collection, shipping and identification of urine specimens for testing.  This procedure includes the utilization of a multi-part chain of custody form with an original that accompanies the specimen to the laboratory.  It also includes the use of a tamper-proof sealing system designed so the specimen bottle top can be sealed against undetected opening.  The bottle will be individually identified and tape initialed by the employee.[19]

The tested employee is allowed "to observe the entire collection, processing, and chain-of-custody procedure of the urine specimen," including reading, signing, and dating the chain-of-custody statement, and verifying the temperature reading on the bottle.[20]  All specimens are sent for testing at a laboratory certified by the United States government.[21]  The initial test is an immunoassay screen.[22]  If a confirmatory test becomes necessary, it is performed by gas chromotography/ mass spectrometry.[23]

---

[18]*Id.* at 3-4.

[19]*Id.* at 6.

[20]*Id.*

[21]*Id.* at 8.

[22]One medical dictionary defines "immunoassay" as "any of several methods for the quantitative determination of chemical substances that utilize the highly specific binding between an antigen or hapten and homologous antibodies, including radioimmunoassay, enzyme immunoassay, and fluoroimmunoassay." *Dorland's Illustrated Medical Dictionary* 910 (30th ed. 2003).

[23]International Paper's evidentiary submission, Tab C ("Drug-Free Workplace Procedures"), at 1-2.  One medical dictionary defines "chromotography" as

> any of a diverse group of techniques used to separate mixtures of substances based on differences in the relative affinities of the substances for two different media, one

All test results are reviewed for accuracy and correctness by a Medical Review Officer ("MRO"), who is "a licensed physician and has knowledge of substance abuse disorders and appropriate medical training to interpret and evaluate employee positive test results together with their medical history and any other relevant biomedical information."[24]   The MRO conducts his review *before* test results are released to International Paper representatives.[25]   If an employee tests positive, the MRO is

---

(the mobile phase) a moving fluid and the other (the stationary phase or sorbent) a porous solid or gel or a liquid coated on a solid support; the speed at which each substance is carried along by the mobile phase depends on its solubility (in a liquid mobile phase) or vapor pressure (in a gas mobile phase) and on its affinity for the sorbent.

*Dorland's Illustrated Medical Dictionary* 360 (30th ed. 2003).  "Gas chromotagraphy" is further defined as

a type of automated chromatography in which the sample, dissolved in a solvent, is vaporized and carried by an inert gas through a column packed with a sorbent to any of several types of detector.  Each component of the sample, separated from the others by passage through the column, produces a separate peak in the detector output, which is graphed by a chart recorder.  The sorbent may be an inert porous solid . . . or a nonvolatile liquid coated on a solid support . . . .

*Id.*  "Spectrometry" is defined as "the determination of the wavelengths or frequencies of the lines in a spectrum."  *Id.* at 1730.  A "mass spectrometer" is

an analytical instrument which identifies a substance by sorting a stream of electrified particles (ions) according to their mass; the sorting is most commonly done as follows: when the stream of charged particles enters a magnetic field, the particles are deflected into semicircular paths varying with their mass and charge components, ultimately striking a photographic plate or photomultiplier tube sensor.

*Id.*

[24]Drug Free Workplace Procedures, at 2.

[25]*Id.* at 9.

required to contact that employee and explore "alternate medical explanations offered by the employee for a positive test result."[26]  "If the MRO determines there is a legitimate medical explanation for a positive test result, the MRO shall report the test result negative."[27]

An employee who tests positive may appeal the test result by filing a written appeal with the MRO within two weeks of the date of the initial determination.  When an appeal is filed, the MRO will instruct the testing laboratory to test a second sample from the same urine specimen using the immunoassay and gas chromotography/mass spectrometry (GC/MS) procedures.  The second test result will be final.  The cost of the test (approximately $75) will be paid by the employee making the appeal. . . .  If the second test result is negative, the employee will be reimbursed for the cost of the test and the final test will be marked negative.  The employee will be notified of this final result in writing.[28]

If an employee tests positive, he "must agree to, sign and fulfill all terms of the return to work agreement or be terminated."[29]  Furthermore,

[e]mployees testing positive will be placed on administrative leave without pay until s/he has received approval from the [Employee Assistance Program ("EAP")] or other company-approved, professional counselor that s/he may return to work.  Prior to returning to work, the employee must take another drug test and have the result be negative.  Management will determine the timing of the employee's return to work.[30]

---

[26]*Id.*

[27]*Id.*

[28]*Id.*

[29]Drug Free Workplace Procedures, at 6.

[30]*Id.* at 10.

As part of the return to work agreement, an employee must submit to a series of at least six random drug tests during the two years following his resumption of employment.[31]  If the employee experiences a second positive test during the course of his employment, he will be terminated.  Additionally, *any* violation of the Policy or Procedures "constitutes grounds for disciplinary action up to and including termination from employment."[32]

International Paper conducted education and awareness sessions with its employees regarding the Policy.[33]   On October 27, 2002, plaintiff signed an acknowledgement that he had attended a "Substance Abuse Policy overview."[34] Plaintiff understood that he could be selected for random drug testing anytime during his employment with International Paper, and he also understood that if he tested positive, his employment could be terminated.[35]

On October 14, 2005, plaintiff was selected for a random drug test.[36]  Before providing a urine sample, plaintiff signed an "Employee Consent for Non-DOT Drug Testing" form, which contained the following language:

---

[31]*Id.*

[32]*Id.* at 6.

[33]Fuller Declaration, at ¶ 8.

[34]Pride Deposition, at 36.  *See also* International Paper's evidentiary submission, at Tab E.

[35]*Id.* at 39.

[36]*Id.*

-10-

> I, Craig Pride, agree to allow International Paper or its designee (the "company") to collect samples of body fluids (including blood and/or urine) and to test the specimens for the presence of drugs, controlled substances, and alcohol. I release International Paper Company and any medical professional, clinic, laboratory, or hospital retained by the Company in connection with the sample collection and testing from liability therefor.[37]

After providing a test specimen, plaintiff signed a Non-DOT Custody and Control form certifying that the specimen had not been altered, that the specimen bottle was sealed with a tamper-evident seal, and that the information provided on the form and the specimen bottle label was correct.[38] According to the Custody and Control Form, the specimen was assigned identification number 0879595651, and it was released to Lab Corp for testing.[39]

Sometime in late October 2005, International Paper received a report that specimen number 0879595651 tested positive for marijuana metabolites, or THC.[40] Because of the positive test result, plaintiff was suspended from work until further notice.[41] Subsequently, during a meeting with International Paper Human Resources personnel and union representatives, plaintiff was given the option of either signing

---

[37]*Id.* at 43-44; International Paper's evidentiary submission, at Tab F ("Employee Consent for Non-DOT Drug Testing").

[38]Pride Deposition, at 45; International Paper's evidentiary submission, at Tab G ("Non-DOT Custody and Control Form").

[39]*See* Non-DOT Custody and Control Form.

[40]International Paper's evidentiary submission, at Tab H.

[41]Pride Deposition, at 55-58.

a Return to Work Agreement or appealing the positive test result by having a second test performed on his specimen.[42]  Plaintiff chose to have his sample retested instead of signing the Return to Work Agreement, because he thought signing the Agreement would be tantamount to admitting the use of illegal drugs.[43]

Northwest Toxicology retested the split sample of plaintiff's specimen, and on December 23, 2005, the MRO sent plaintiff a letter stating that the second test reconfirmed the presence of marijuana or THC.[44]  On January 19, 2006, International Paper again offered plaintiff the opportunity to sign a Return to Work Agreement, but plaintiff again refused because he did want to admit that he had used illegal drugs.[45] International Paper terminated plaintiff's employment on February 17, 2006, for violation of the International Paper Substance Abuse Policy.[46]

On February 20, 2006, plaintiff filed a grievance alleging that he had been unjustly suspended and terminated.[47]  International Paper denied the grievance by

---

[42]*Id.* at 62-64.  *See also* International Paper's evidentiary submission, at Tab I (proposed Return to Work agreement).

[43]Pride Deposition, at 65-66.

[44]*Id.* at 74; International Paper's evidentiary submission, at Tab J (December 23, 2005 letter from MRO).

[45]Pride Deposition, at 91-92; Fuller Declaration, at ¶ 11; International Paper's evidentiary submission, at Tab K (January 19, 2006 proposed Return to Work Agreement).

[46]Pride Deposition, at 113-14; International Paper's evidentiary submission, at Tab L (February 17, 2006 termination letter).

[47]Pride Deposition, at 93, 116-17; International Paper's evidentiary submission, at Tab N (grievance form).

letter dated May 24, 2006, stating:

>        The grievant, Craig Pride, was terminated following refusals to sign the return to work agreement following a failed drug test.
>
>        After hearing the grievant and reviewing the facts of the case, it is clear the grievant did not and has not complied with the requirements of the Drug Free Workplace Policy thus, this grievance must be denied. [sic][48]

The grievance was referred to arbitration, and an arbitration hearing was held on January 17, 2007, in Decatur, Alabama.[49]  Emory Barnette, the Union International Representative, represented plaintiff at the hearing.[50]  Plaintiff testified at the hearing, and two other witnesses — Joe Marshall, the Union president, and Trophelia Moseley, a co-worker — also testified on plaintiff's behalf.[51]  Barnette gave opening and closing statements, and he cross-examined the only witness who testified for International Paper.[52]  The arbitrator received evidence and accepted post-hearing briefs from both sides.[53]  The arbitrator issued an opinion on July 6, 2007, finding that International Paper "did not suspend [plaintiff] unjustly or terminate [plaintiff's]

---

[48]International Paper's evidentiary submission, Tab O (May 24, 2006 letter); *see also* Pride Deposition, at 117.

[49]Pride Deposition, at 117-18; International Paper's evidentiary submission, Tab M (Opinion and Award of Arbitrator), at 2.

[50]Pride Deposition, at 118.

[51]*Id.* at 122; Fuller Declaration, at ¶ 14.

[52]Pride Deposition, at 119, 122; Fuller Declaration, at ¶ 14.

[53]Fuller Declaration, at ¶14.

employment unjustly."[54]   The arbitrator consequently denied plaintiff's grievance,

holding that plaintiff's suspension and termination were "justified and in accordance

with the Labor Agreement and the Substance Abuse Policy."[55]   Plaintiff did not

appeal the arbitrator's ruling, and he did not file any claim against the Union for its

handling of the grievance or the arbitration.[56]

## III.  DISCUSSION

A.    **Motion for Sanctions**

Plaintiff argues that sanctions should be imposed against International Paper

for failure to comply with this court's orders.   On December 11, 2008, this court

entered an order requiring plaintiff to file a response to International Paper's motion

for summary judgment by January 23, 2009, and requiring International Paper to file

a reply submission by February 3, 2009.[57]   Plaintiff filed his response to International

Paper's motion for summary judgment before the deadline, but International Paper

did not file a reply.   As a result, plaintiff "requests that this court issues [sic] sanctions

against International Papers [sic] and finds [sic] that all statements and allegations

made against International Papers [sic] in Plaintiff's response to the motion for

---

[54]Opinion and Award of Arbitrator, at 16.

[55]*Id.* at 17.

[56]Fuller Declaration, at ¶ 16.

[57]Doc. no. 39.

summary judgment are deemed admitted."[58]

The court finds no basis for imposing sanctions against International Paper. Although the court's December 11, 2008 order did contain mandatory language regarding International Paper's obligation to file a reply by a certain date,[59] that language was intended to indicate the filing *deadline*, not to impose an absolute requirement that International Paper file a reply submission. Stated differently, *if* International Paper wanted to file a reply, it was required to do so by February 3, 2009. However, International Paper was free to choose *not* to file a reply if it did not feel the need to address any of the arguments raised in plaintiff's response. Apparently that is the choice International Paper made.

Furthermore, there is no basis for plaintiff's argument that the court should deem all of the statements and allegations he made in his response brief to be admitted. Plaintiff's brief does not contain a statement of disputed or undisputed facts; consequently, the court cannot deem any facts to be admitted due to International Paper's failure to reply. With regard to the legal arguments plaintiff made in his response brief, the court will duly consider the fact that defendant did not reply to those arguments, but that does not mean that the court must blindly accept

---

[58]Doc. no. 51, at 2.

[59]*See* doc. no. 39, at 2 ("International Paper *must* file a reply to plaintiff's response on or before February 3, 2009.") (emphasis supplied).

-15-

everything plaintiff has written.

In summary, plaintiff's motion for sanctions against International Paper should, and will, be denied.

## B.     Motion for Summary Judgment

International Paper argues that summary judgment should be granted on plaintiff's negligence claim for the following reasons: (1) the claim is pre-empted by the Labor Management Relations Act; (2) the claim is barred by collateral estoppel; (3) the claim is barred by plaintiff's signed release; and (4) plaintiff has no evidence to support the negligence claim.

### 1.     Pre-emption

International Paper first argues that plaintiff's negligence claim is pre-empted by the Labor Management Relations Act ("LMRA"). Plaintiff did not dispute this point in his response brief,[60] and the court agrees that the claim is pre-empted.

Section 301 of the LMRA provides that

> [s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without

---

[60]*See* doc. no. 42 (plaintiff's brief). Plaintiff did argue in his brief that he has sufficient evidence to support claims for wantonness and invasion of privacy. *See id.* at 4-6. However, plaintiff's complaint only stated those claims against Lab Corp, not against International Paper. *See* Complaint, at Counts Two and Three.

regard to the citizenship of the parties.

29 U.S.C. § 185(a).   "[W]hen resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim . . . or dismissed as pre-empted by federal labor-contract law." *Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202, 220 (1985) (citation omitted).  Stated slightly differently, for a state law claim to be pre-empted by § 301, the claim must "require[] the interpretation of a collective-bargaining agreement." *Lingle v. Norge Division of Magic Chef, Inc.,* 486 U.S. 399, 413 (1988).  Furthermore, "a state-law tort action against an employer may be pre-empted by § 301 if the duty to the employee of which the tort is a violation is created by a collective-bargaining agreement and without existence independent of the agreement." *United Steelworkers of America, AFL-CIO v. Rawson,* 495 U.S. 362, 369 (1990) (citing *Allis-Chalmers*, 471 U.S. at 211).

Plaintiff's negligence claim against International Paper is based upon International Paper's alleged "duty of care to Plaintiff to ensure that Labcorp's test results were accurate and/or consistent before taking adverse action against Plaintiff,"[61] and International Paper's alleged breach of this duty "by failing [to] reinvestigate and/or have additional testing performed on Plaintiff despite Plaintiff's

---

[61]Complaint, at ¶ 34.

repeated requests."[62] International Paper's guidelines for handling drug testing claims are outlined in the International Paper Substance Abuse Policy and the Drug-Free Workplace Procedures, which are incorporated by reference into the CBA. These guidelines include procedures for conducting drug tests, confirming initial positive test results, and disciplining employees who violate the Policy. Thus, International Paper's alleged duty to plaintiff, as well as its alleged breach of that duty, arise from the terms of the CBA itself. Consequently, plaintiff's negligence claim against International Paper is "substantially dependent" upon analysis of the terms of the CBA, and it should be dismissed as pre-empted by the LMRA.[63]

## 2. Collateral Estoppel

International Paper also argues that plaintiff's negligence claim is barred by collateral estoppel. Plaintiff did not dispute this point in his brief, and the court agrees that collateral estoppel bars the claim.

Within the Eleventh Circuit, a party claiming the preclusive benefit of the doctrine of collateral estoppel must show that: (1) the issues of fact or law at stake

---

[62]*Id.* at ¶ 35.

[63]The court acknowledges that it also has the option of treating plaintiff's negligence claim as one under § 301 of the LMRA, rather than dismissing it outright. *See Allis-Chalmers*, 471 U.S. at 220 (holding that a pre-empted claim "must *either* be treated as a § 301 claim . . . *or* dismissed as pre-empted by federal labor-contract law") (emphasis supplied). The court notes, however, that plaintiff has not objected to the dismissal of his negligence claim due to LMRA pre-emption. Furthermore, even if the court chose to retain the negligence claim, but to treat it as one under the LMRA, other grounds exist for dismissing that claim, as discussed more fully below.

in the present action are identical to issues decided in the earlier litigation; (2) the issues were actually litigated on the merits in the prior suit; (3) the determination of the issues in the prior litigation was a critical and necessary part of the judgment in that case; and (4) the parties against whom collateral estoppel is asserted in the present action had a full and fair opportunity to litigate the issues in the prior proceeding. *See*, *e.g.*, *Pleming v. Universal-Rundle Corp.*, 142 F.3d 1354, 1359 (11th Cir. 1998). "An arbitration decision can have res judicata or collateral estoppel effect." *Greenblatt v. Drexel Burnham Lambert, Inc.,* 763 F.2d 1352, 1360 (11th Cir. 1985) (citations omitted).

> When an arbitration proceeding affords basic elements of adjudicatory procedure, such as an opportunity for presentation of evidence, the determination of issues in an arbitration proceeding should generally be treated as conclusive in subsequent proceedings, just as determinations of a court would be treated. Restatement (Second) of Judgments § 84(3) and comment c (1982).

*Id. See also* 18B Charles Alan Wright, Arthur R. Miller, and Edward H. Cooper, Federal Practice and Procedure § 4475.1 (2d ed. 2002) ("In developing the rules for claim preclusion, it seems safe to infer that most agreements to submit disputes to arbitration contemplate that the award will merge or bar all of the claims and defenses involved in the submission, whether the agreement is made before or after the dispute has arisen. If any party dissatisfied with the award were left free to pursue

independent judicial proceedings on the same claim or defenses, arbitration would be substantially worthless.  Unless the express terms of the agreement or the peculiar custom of a trade dictate otherwise, therefore, subsequent judicial proceedings on the same claim or defenses ordinarily should [be] precluded.  And so the courts rule.").

Here, plaintiff enjoyed "the basic elements of adjudicatory procedure" during the arbitration proceedings.  *See Greenblatt,* 763 F.2d at 1360.  He was represented at the hearing, and he presented his own testimony as well as that of other witnesses.  He also had the opportunity to cross-examine International Paper's witness, to offer exhibits, and to make opening and closing statements.  Therefore, the arbitrator's decision should be evaluated for its preclusive effect just as a judicial decision would be.

All of the usual requirements for the application of collateral estoppel are satisfied here.  First, the issues at stake in this case are identical to those presented at the arbitration.   The arbitrator considered whether plaintiff had been unjustly suspended and terminated for alleged violations of the company's Drug Free Work Place Policy.  He also considered the CBA entered into between International Paper and the Union, including the CBA's references to International Paper's Substance Abuse Policy.  The arbitrator determined that International Paper followed the requirements of the Substance Abuse Policy when it was processing plaintiff's drug

test results, and that the company was justified in terminating plaintiff's employment after he refused to sign a Return to Work Agreement. The arbitrator's determination of these issues was a "critical and necessary" part of his judgment — indeed, these issues formed the *sole* basis of the arbitrator's judgment. Furthermore, these same issues — the processing of plaintiff's drug test results and the company's decision to terminate plaintiff's employment after he refused to sign a Return to Work Agreement — form the basis for plaintiff's negligence claim in this case.

Finally, these issues were actually litigated on the merits during the arbitration. As discussed above, plaintiff was represented at the hearing, presented testimony and exhibits, cross-examined International Paper's witness, offered exhibits, and made opening and closing statements. These same factors demonstrate the satisfaction of the fourth element of collateral estoppel, *i.e.,* that plaintiff had a full and fair opportunity to litigate the issues in the prior proceeding.

### 3.    Release of liability

Next, International Paper argues that plaintiff's negligence claim is barred by the release he signed on October 14, 2005. Plaintiff agreed to "release International Paper Company and any medical professional, clinic, laboratory, or hospital retained by the Company in connection with the sample collection and testing from liability

therefor."[64]

A written release of claims that are (or may become) the subject of suit, if supported by sufficient consideration, is enforceable under Alabama law. The Code of Alabama specifically provides that "[a]ll receipts, releases and discharges in writing . . . must have effect according to their terms and the intentions of the parties thereto." Ala. Code § 12-21-109 (1975) (2005 Replacement Vol.). The Supreme Court of Alabama has elaborated on this statutory language, saying that, in the absence of fraud, a release supported by valuable consideration, and unambiguous in meaning, will be given effect according to the intention of the parties as determined by the court. *See, e.g., Jehle-Slauson Construction Company v. Hood-Rich, Architects and Consulting Engineering*, 435 So. 2d 716, 719 (Ala. 1983).

Despite plaintiff's conclusory assertion to the contrary, the language of the release he signed is not ambiguous.[65] The clear language of the release reflects the

---

[64]Pride Deposition, at 43-44; International Paper's evidentiary submission, at Tab F ("Employee Consent for Non-DOT Drug Testing").

[65]Plaintiff's entire response to defendant's argument that the release bars his claims is as follows:

> Simply because the release forms in the third paragraph coerce and threaten the employee of his employment if he fails to cooperate in any stage of this process. Such release is ambiguous, and there exists evidence of gross negligence, wantonness, and misconduct. Employee human rights, constitutional rights, and civil rights were violated. Tests were without warrant and probable cause. Consequently, the employee did not violate the drug free work place policies.

Doc. no. 42 (plaintiff's brief), at 6.

parties' intent to release International Paper from any liability resulting from the collection and testing of his urine sample. Furthermore, there is no evidence of fraud, and there has been no argument that the release agreement was not supported by valuable consideration. Plaintiff alleges, without any further argument or citation to legal authority, that the release forms coerced and threatened him; that International Paper engaged in gross negligence, wantonness, and misconduct; and that his civil rights were violated during the testing process.[66]   To begin with, plaintiff did not make any of these allegations in his complaint. Further, plaintiff has failed to explain how any of these allegations would result in a finding that the release is unenforceable. The court will not give consideration to arguments that are not fully developed or bolstered with legal authority. *See U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (refusing to address a party's "perfunctory and underdeveloped argument") (citing *Flanigan's Enterprises*, *Inc. v. Fulton County*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that "fail[ure] to elaborate or provide any citation of authority in support [of an argument]" results in waiver)). *See also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it").

---

[66]*See* the preceding footnote.

In summary, because the language of the release form is clear and unambiguous, and because plaintiff has not offered any reason why the release agreement should not be enforced, the court concludes the release form plaintiff signed on October 14, 2005 bars his negligence claim against International Paper.

### 4.     Lack of evidence of negligence

Finally, International Paper argues that plaintiff's negligence claim "must fail for lack of evidence."[67]   A negligence claim based upon Alabama law requires a plaintiff to prove four elements:   (1) the defendant owed plaintiff a duty; (2) defendant breached that duty; (3) plaintiff suffered a loss or injury; and (4) the defendant's breach was the actual and proximate cause of the plaintiff's loss or injury. *See Ford Motor Co. v. Burdeshaw*, 661 So. 2d 236, 238 (Ala. 1995).   International Paper asserts that plaintiff has produced no evidence that it breached any duty it owed to him.   Upon review of the record, this court agrees.

There is no evidence that International Paper was involved in the actual testing of plaintiff's urine specimen.   After providing the specimen, plaintiff signed a form certifying that the specimen had not been altered, that the specimen bottle was sealed with a tamper-evident seal, and that the information provided on the form and the specimen bottle label was correct.   When plaintiff received a positive test result,

---

[67]Doc. no. 26 (defendant's brief), at 20.

International Paper followed its policies by giving plaintiff the option of having his sample retested or signing a Return to Work Agreement. When plaintiff chose to have the sample retested, International Paper sent the sample to a different laboratory. Again, there is no evidence that International Paper was involved in the actual re-testing of the specimen. When the re-test revealed a second positive result, International Paper offered plaintiff a second opportunity to sign a Return to Work Agreement, as required by the Substance Abuse Policy. International Paper only terminated plaintiff's employment after he refused to sign the Return to Work Agreement. In summary, International Paper followed all of the procedures set forth in its Substance Abuse Policy for conducting drug tests, for dealing with positive results, and for offering employees the chance to sign agreements to return to work. As International Paper "did everything it was supposed to do"[68] with regard to plaintiff's drug test results, it cannot be held liable for negligence.

Plaintiff's arguments to the contrary are unavailing. Plaintiff acknowledges that, because he "is not trained in conducting urinalysis examinations, he cannot specifically identify the negligent procedure" defendant allegedly used.[69] Even so, plaintiff insists that "since two subsequent urinalysis test[s] reported negatively,[70] it

---

[68]*Id.* at 21.

[69]Doc. no. 42 (plaintiff's brief), at 4.

[70]The court assumes that plaintiff is referring to the results of two drug tests he took, on his

is implicit that Lab Corp failed to conform its conduct to the applicable standard of care, and IP have the records [sic]."[71]  First of all, plaintiff is arguing that *Lab Corp* — not International Paper — breached a duty of care.  Plaintiff's only remaining claim is against International Paper, not Lab Corp.  Further, the existence of two subsequent negative test results, without more, sheds no light on the issue of whether International Paper was negligent in handling plaintiff's drug test.  Plaintiff's mere speculation that International Paper must have breached some duty is insufficient to support a negligence claim.  *See, e.g.*, *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("'Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.'")  (quoting *Hedberg v. Indiana Bell Telephone Co.*, 47 F.3d 928, 931-32 (7th Cir. 1995)).[72]

## IV. CONCLUSION AND ORDER

For all of the foregoing reasons, plaintiff's motion for sanctions is DENIED.  International Paper's motion for summary judgment is due to be, and it hereby is

---

own initiative, at Quest Diagnostics on November 21 and December 2, 2005.  *See* Pride Deposition, at 98, 101. Plaintiff tested negative for the presence of THC metabolite on both occasions.  *Id*.

[71]Doc. no. 42 (plaintiff's brief), at 4.

[72]This court recognizes that, under Alabama law, "summary judgment is rarely appropriate in negligence . . . cases." *Ex parte Mountain Top Indoor Flea Market, Inc*., 699 So. 2d 158, 161 (Ala. 1997).  Even so, summary judgment is appropriate here, because plaintiff has failed to present *any* evidence indicating that International Paper breached a duty to perform additional testing, or negligently analyzed the urine specimen, or negligently reported the results of its evaluation.

GRANTED.  Plaintiff's remaining claim against International Paper (Count VI of the complaint) is DISMISSED with prejudice.  Costs are taxed to plaintiff.  The Clerk of court is directed to close this file.

DONE this 5th day of August, 2009.

United States District Judge